· STATE OF NORTH CAROLINA v. ELTON GUY BELL

No. 421A92

(Filed 9 December 1994)

## 1. Criminal Law § 411 (NCI4th)— jury selection—identification of victim's family

The prosecutor's identification of members of the victim's family during jury selection in a capital trial to determine whether prospective jurors knew them did not require *ex mero motu* intervention by the trial court.

**Am Jur 2d, Trial §§ 490 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

## 2. Jury § 132 (NCI4th)— jury selection—ability to give defendant, victim's family, State a fair trial

It was not improper for the prosecutor to ask prospective jurors in a capital trial whether they could give defendant, the victim's family, and the State a fair trial.

**Am Jur 2d, Jury §§ 201, 202.**

## 3. Criminal Law § 447 (NCI4th)— closing argument—effect of killing upon victim's family—absence of prejudice

Defendant was not prejudiced by the prosecutor's comments during closing argument about the effect of the killing of the victim upon the victim's family where the trial court sustained defendant's objection or intervened *ex mero motu* each time the prosecutor mentioned any effect of the killing upon the victim's family, and where there was substantial evidence supporting defendant's conviction for first-degree murder.

Am Jur 2d, Trial §§ 664 et seq.

Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.

### 4. Criminal Law § 78 (NCI4th)— pretrial publicity—change of venue denied

The trial court did not err in denying defendant's motion for a change of venue of his first-degree murder trial based on pretrial publicity where (1) newspaper articles and a videotape of news coverage submitted by defendant in support of his motion were primarily factual accounts of the murder, the arrest of defendant, and a two-day search in a national forest for the codefendant, and (2) although a number of prospective jurors indicated that they had read or heard of the crime, each juror who actually served on the jury stated unequivocally that he or she had formed no opinion about the case, could be fair and impartial, and would decide the issues based solely upon the evidence presented at trial.

Am Jur 2d, Criminal Law § 378.

Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.

### 5. Jury § 111 (NCI4th)— capital trial—pretrial publicity— denial of individual voir dire

The trial court did not err by failing to allow defendant to individually question each prospective juror during *voir dire* in a capital trial with respect to pretrial publicity.

Am Jur 2d, Jury § 197.

### 6. Constitutional Law § 283 (NCI4th)— defendant represented by counsel—no right to personally question jurors

A criminal defendant represented by counsel was not entitled to personally ask each prospective juror whether the juror would "listen to [his] case and be fair," since a defendant has no right to appear both by himself and by counsel.

Am Jur 2d, Criminal Law § 767.

Right of defendant in criminal case to conduct defense in person, or to participate with counsel. 77 ALR2d 1233.

Accused's right to represent himself in state criminal proceeding—modern state cases. 98 ALR3d 13.

STATE v. BELL

[338 N.C. 363 (1994)]

**7. Evidence and Witnesses § 1688 (NCI4th)— murder of undercover officer—photograph of officer in uniform— admission for illustrative purposes**

In a prosecution for the first-degree murder of an undercover officer involved in a drug investigation, a photograph of the victim wearing his police uniform and standing in front of a patrol car was not introduced merely to inflame the passions of the jury but was properly admitted to illustrate a detective's testimony concerning the size and weight of the victim where defendant's defense of self-defense necessitated a showing by the State that a much larger man attacked the victim and knocked him down and defendant then shot and killed him.

**Am Jur 2d, Evidence §§ 971 et seq.**

**Admissibility of visual recording of event or matter other than that giving rise to litigation or prosecution. 41 ALR4th 877.**

**8. Evidence and Witnesses § 3015 (NCI4th)— prior convictions—scope of cross-examination**

The trial court properly restricted defendant's cross-examination of the State's key witness about his prior convictions for breaking and entering and larceny to the time and place of the convictions and the penalties imposed thereon. N.C.G.S. § 8C-1, Rule 609.

**Am Jur 2d, Witnesses §§ 581 et seq.**

**Propriety, on impeaching credibility of witness in criminal case by showing former conviction, of questions relating to nature and extent of punishment. 67 ALR3d 775.**

**Construction and application of Rule 609(a) of the Federal Rules of Evidence permitting impeachment of witness by evidence of prior conviction of crime. 39 ALR Fed 570.**

**9. Evidence and Witnesses §§ 3039, 3054 (NCI4th)— witness's prior acts of misconduct—larceny—possession of marijuana—cross-examination not allowed**

The trial court did not err by refusing to permit defendant to question a State's witness in a murder-robbery trial about several prior unrelated acts of misconduct involving larceny and posses-

STATE v. BELL

[338 N.C. 363 (1994)]

sion of marijuana since these acts of misconduct are not necessarily probative of the witness's propensity for truthfulness or untruthfulness, and defendant failed to show that these incidents are relevant to the witness's general veracity. N.C.G.S. § 8C-1, Rule 608(b).

**Am Jur 2d, Witnesses §§ 591-595.**

**Construction and application of Rule 608(b) of Federal Rules of Evidence dealing with use of specific instances of conduct to attack or support credibility. 36 ALR Fed 564.**

10. **Evidence and Witnesses § 3032 (NCI4th)— fraud and deceit by witness—cross-examination disallowed—harmless error**

While the trial court should have permitted defendant to cross-examine a State's witness in a murder-robbery trial concerning an attempt by the witness to lure an acquaintance from his home so his accomplices could break into and steal property from the residence in order to show the propensity of the witness to deceive and defraud others because such misrepresentations speak to the veracity of the witness, the exclusion of this testimony was not prejudicial error where the witness admitted during either direct or cross-examination that he had (1) used and sold marijuana, (2) pled guilty to breaking and entering and larceny charges, (3) served time in prison, and (4) became an informant partially to improve his efforts at plea bargaining; the jury had before it sufficient evidence, including proof of bias, to evaluate the witness's credibility; and no reasonable possibility exists that a different result would have been reached had the testimony been allowed.

**Am Jur 2d, Witnesses §§ 591-595.**

**Construction and application of Rule 608(b) of Federal Rules of Evidence dealing with use of specific instances of conduct to attack or support credibility. 36 ALR Fed 564.**

11. **Evidence and Witnesses § 664 (NCI4th)— exclusion of testimony—subsequent revision of ruling**

Exceptions to the exclusion of competent testimony showing defendant's motivation for going to the scene of a fatal shooting became immaterial when the trial judge subsequently revised his ruling and admitted the testimony.

**Am Jur 2d, Trial §§ 395 et seq.**

**12. Evidence and Witnesses §§ 2877, 3052 (NCI4th)— drug use by defendant's son—knowledge of wife—relevancy of cross-examination**

In a prosecution for first-degree murder of an undercover police officer, the State's cross-examination of defendant's son concerning his use of marijuana and defendant's wife concerning her knowledge of her son's involvement with illegal drugs was not an attempt to impeach the witnesses' character for truthfulness in violation of N.C.G.S. § 8C-1, Rule 608(b), but was relevant and properly permitted under N.C.G.S. § 8C-1, Rule 611(b) to rebut defendant's contention that he went to the crime scene to confront the State's informant about his attempts to lure defendant's son into using and selling drugs rather than to steal drugs from the victim and the informant.

**Am Jur 2d, Witnesses §§ 484 et seq., 591-595.**

**Construction and application of Rule 608(b) of Federal Rules of Evidence dealing with use of specific instances of conduct to attack or support credibility. 36 ALR Fed 564.**

**13. Homicide § 620 (NCI4th)— felony murder—defendant as aggressor—instruction on unavailability of self-defense**

The trial court did not err by instructing the jury that the defense of self-defense was unavailable to defendant if the jury concluded that defendant killed the victim in the perpetration of a felony where the evidence tended to show that defendant was the aggressor in that he and an accomplice went to the crime scene to rob the victim and another person of marijuana, and no evidence was presented to suggest that the dangerous situation had dissipated at the time of the shooting or that defendant made any effort to declare his intent to withdraw.

**Am Jur 2d, Homicide §§ 519 et seq.**

**14. Homicide § 86 (NCI4th)— felony murder—forfeiture of self-defense claim**

A defendant charged with felony murder, as the aggressor in the underlying felony, forfeits his right to claim self-defense as a defense to the felony murder absent (1) a reasonable basis upon which the jury may have disbelieved the prosecution's evidence of the underlying felony, (2) a factual showing that defendant clearly articulated his intent to withdraw from the situation, or

(3) a factual showing that at the time of the violence the dangerous situation no longer existed.

. **Am Jur 2d, Homicide §§ 145 et seq.** .

15. **Homicide § 257 (NCI4th)— premeditation and deliberation—sufficiency of evidence**

The evidence in a first-degree murder prosecution was sufficient to support the trial court's instruction on premeditation and deliberation where it tended to show that defendant carried a pistol with him to a meeting with the victim, who was an undercover police officer, and another person; defendant intended to rob the victim of marijuana; on the way to the meeting, defendant removed the clip from his pistol, rejected the round from the chamber, replaced the round in the clip, and chambered a live round of ammunition, thus readying the weapon for firing; defendant's own testimony suggested that he harbored ill will toward the victim and the other person; during the meeting, defendant's accomplice struck the victim and knocked him to the ground; the victim reached for his weapon and stated, "Stop or I'll shoot" while attempting to rise from the ground; and defendant replied, "You won't shoot anybody" and shot the victim through the heart.

**Am Jur 2d, Homicide §§ 437 et seq.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

16. **Homicide § 489 (NCI4th)— premeditation and deliberation—circumstances permitting inference—instruction not plain error.**

Even if the trial court instructed on several circumstances from which premeditation and deliberation could be inferred which were not supported by the evidence, defendant failed to object to the instruction given, and the instruction was not plain error where the case came down to whether the jury believed defendant's or the State's version of the events; the jury reasonably concluded that defendant killed the victim with premeditation and deliberation and during the commission of an armed robbery; and defendant failed to show that, absent the challenged portions of the instruction, the jury would probably have reached a different verdict.

**Am Jur 2d, Homicide §§ 501.**

STATE v. BELL

[338 N.C. 363 (1994)]

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

17. **Homicide § 625 (NCI4th)— self-defense—withdrawal by aggressor—instruction not required**

The trial court in a first-degree murder case did not err by failing to give defendant's requested self-defense instruction that "[a]s long as a person keeps his gun in his hand prepared to shoot, the person opposing him is not expected or required to accept any statement indicative of an intent to discontinue the assault" where the evidence in the record does not support a finding that defendant attempted, at any point, to withdraw from the combat or that he ever indicated to the victim that he intended to withdraw from the combat.

**Am Jur 2d, Homicide §§ 520.**

18. **Homicide § 622 (NCI4th)— self-defense—instruction on defendant as aggressor—sufficient evidence**

There was sufficient evidence that defendant was the aggressor to support the trial court's instruction in a first-degree murder case that defendant may not claim self-defense if the jury finds defendant was the aggressor in the encounter leading to the fatal shooting where there was testimony that defendant pulled his weapon on the victim, an undercover police officer, after defendant's accomplice had knocked the officer to the ground and that the officer never actually drew his gun.

**Am Jur 2d, Homicide §§ 431.**

19. **Homicide § 628 (NCI4th)— self-defense—use of excessive force—jury question—propriety of instruction**

The evidence in a prosecution for the first-degree murder of an undercover police officer presented a question for the jury as to whether defendant used excessive force so that the trial court properly instructed the jury that, if it found defendant to have used excessive force in defending himself, he was entitled, at most, to the defense of imperfect self-defense where the testimony of various witnesses differed as to when defendant and the officer drew their weapons and as to the circumstances leading to the fatal shooting.

**Am Jur 2d, Homicide §§ 519 et seq.**

**20. Homicide § 432 (NCI4th)— murder—intentional use of deadly weapon—inferences of unlawfulness and malice**

The trial court properly instructed the jury that it could infer that a killing was unlawful and committed with malice if it found that defendant intentionally inflicted a wound upon the victim with a deadly weapon that proximately caused the victim's death.

**Am Jur 2d, Homicide §§ 500, 509.**

**21. Homicide § 476 (NCI4th)— premeditation—instruction—formation of intent to kill**

The trial court did not err by instructing the jury that it must find that defendant formed the intent to kill the victim over some period of time, however short, in order to find defendant guilty of first-degree murder based upon premeditation and deliberation.

**Am Jur 2d, Homicide §§ 498.**

**22. Homicide § 497 (NCI4th)— felony murder—underlying felony—attempted armed robbery**

The trial court properly instructed that the jury could consider only an attempted armed robbery charge as the underlying felony for felony murder and did not permit the jury to consider a conspiracy charge as the underlying felony.

**Am Jur 2d, Homicide §§ 498.**

**23. Conspiracy § 33 (NCI4th); Robbery § 84 (NCI4th)— armed robbery conspiracy—attempted armed robbery—sufficiency of evidence**

The evidence was sufficient to support defendant's convictions of conspiracy to commit armed robbery and attempted armed robbery where it tended to show that defendant told his accomplice of his plan to rob an undercover police officer and his companion of marijuana that the officer and his companion proposed to sell to defendant; defendant armed himself with a pistol and chambered the weapon as he and the accomplice drove to a meeting with the officer and his companion; at the scene, defendant's accomplice knocked the officer down as he had been instructed to do by defendant as part of the robbery plan; and defendant shot the officer when the officer attempted to get out his weapon. The conduct of defendant and his accomplice supports an implied understanding between them to use a gun in the commission of the crime, and the failure of the conspirators to

STATE v. BELL

[338 N.C. 363 (1994)]

actually take the marijuana did not negate the attempted armed robbery.

**Am Jur 2d, Conspiracy §§ 29, 30; Robbery § 89.**

**24. Homicide § 727 (NCI4th)— first-degree murder—premeditation and deliberation and felony murder—no merger of felony**

Where a defendant is convicted of first-degree murder based upon both premeditation and deliberation and felony murder, the underlying felony does not merge with the murder conviction and the trial court is free to impose a sentence thereon.

**Am Jur 2d, Homicide §§ 549 et seq.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by Phillips, J., at the 16 March 1992 Criminal Session of Superior Court, Carteret County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for attempted robbery with a firearm and felony conspiracy to commit robbery with a deadly weapon was allowed 22 December 1992. Heard in the Supreme Court 15 September 1993.

*Michael F. Easley, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Stephen M. Valentine for defendant-appellant.*

PARKER, Justice.

Defendant, upon proper bills of indictment, was tried capitally and convicted of first-degree murder based on premeditation and deliberation and the felony-murder rule. Defendant was also convicted of felony conspiracy to commit robbery with a deadly weapon and attempted robbery with a firearm. Upon the jury's recommendation following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the trial judge sentenced defendant to life imprisonment for the murder conviction and to consecutive sentences of forty years' imprisonment for the attempted armed-robbery conviction and ten years' imprisonment for the conspiracy conviction. For the reasons discussed below, we conclude that defendant's trial was free from prejudicial error.

**STATE v. BELL**

[338 N.C. 363 (1994)]

The State presented evidence at trial tending to show that the victim, Donald Ray Tucker ("Officer Tucker"), a Clinton police officer, was working undercover as part of a drug investigation being conducted in Carteret County by the sheriff's department. To establish his new identity, Officer Tucker grew a beard, wore granny glasses, adopted the name "Sand Man," and professed to being a big time out-of-state drug dealer. As part of his cover, Officer Tucker became associated with Mark Balch ("Balch"), a local resident with a long history of drug offenses who had served time in prison for breaking and entering and larceny. Balch was paid a fee for turning in and assisting with the arrest of individuals involved with drugs. Balch had assisted Officer Tucker in making over seventy-five drug buys resulting in twenty-five successful arrests.

Pursuant to this arrangement, Balch began contacting David Bell ("David"), defendant's fifteen-year-old son whom Balch had seen on occasion with hashish in his possession. During the various communications, David offered to sell Balch some hashish. When Balch called to confirm the deal, David said he was having trouble getting the "stuff." Balch and Officer Tucker went to the Bell residence to complete the transaction but were confronted by defendant. Initially, Balch told defendant he was there only to take David skateboarding but later admitted he hoped to purchase some hashish from David. Defendant informed them the "hash was gone" but said his older son was on a fishing boat and would return with "some good hash" at the end of the week. However, when Balch called back, defendant still had no hashish. On this occasion, Balch offered to sell defendant some marijuana.

The parties met on 12 November 1991 at George's Party Pak to discuss the marijuana sale. Defendant asked Balch and Officer Tucker to follow him out to Salty Shores, a small campground near the marina. Defendant sampled the marijuana and then agreed to pay $5,400 for five pounds. They made plans to meet again on 14 November 1991 to complete the transaction.

At noon on the fourteenth, Balch telephoned defendant and was told to meet him "across the Broad Creek Loop down at the sound." Balch and Officer Tucker, riding in a white Mustang with tinted windows, arrived approximately five minutes prior to defendant. Defendant and his brother-in-law, Joey Lewis ("Lewis"), drove up in a green pickup truck. Balch said, "There's too many people out here, I don't like it here, let's get out of here." Defendant looked at Balch and said

okay. Balch and Officer Tucker then followed defendant and Lewis to Bluewater Banks. Once the vehicles were parked, all four men moved to the rear of the Mustang. Officer Tucker placed the same duffel bag he had used at the earlier meeting on the trunk of the automobile and asked defendant if he had the money. Defendant answered, "We've got the f——— money, where's the pot?" After Officer Tucker opened the bag, Lewis rolled a joint for defendant to test the marijuana.

As defendant smoked the joint and commented on the quality of the seeds and stems, Lewis, standing six feet six inches tall and weighing approximately 350 pounds, suddenly backhanded Officer Tucker, knocking him to the ground. According to Balch's testimony, defendant was silhouetted against the white Mustang as he stood over the officer with a gun pointed at him. The fully extended hammer on the weapon was easily visible and the gun was pointed directly at Officer Tucker. Officer Tucker, attempting to rise from the ground, started to reach for his weapon and yelled, "Stop or I'll shoot." Defendant replied, "You won't shoot anybody" and shot Officer Tucker through the heart.

Following the shooting, Balch ran to a nearby house and called the authorities. Lewis escaped into the Croatan National Forest before turning himself in to the local authorities on the following Saturday. Defendant left the scene of the crime without taking the marijuana or any of Officer Tucker's personal belongings. He returned to the scene within an hour and was identified by Balch as the shooter. Defendant was subsequently arrested.

Lewis testified for the State that on the day of the shooting, he went over to defendant's home. Defendant asked if he was "[r]eady to go to work and make some money." Lewis learned that defendant's plan was to lure Balch and Officer Tucker to the scallop house at the end of the shore road and pretend that the two men were attempting to "rip us off by selling us a bunch of bad marijuana." Lewis was then to hit one of the men while defendant hit the other so they could steal the marijuana. Lewis agreed to participate and at the arranged time, drove defendant to the shore in his truck. On the way, defendant removed a pistol from his waistband, ejected the magazine, ejected a round from the chamber, chambered a round, replaced the magazine, released the hammer, and concealed the weapon in his waistband. When Lewis and defendant arrived at Salty Shores, defendant asked Balch and Officer Tucker to follow them to Bluewater Banks. Defendant then told Lewis that they should also steal "their watches, their

STATE v. BELL

[338 N.C. 363 (1994)]

rings, and their wallets." Once they arrived at Bluewater Banks, all four men stood around the white Mustang. While Lewis examined the marijuana, defendant told him to roll a joint. As defendant lit the joint, Lewis backhanded Officer Tucker, knocking him to the ground. He turned and noticed Balch running away from the scene. When he turned back around, Officer Tucker was holding a pistol, aimed directly at him, and saying, "You son of a b——, I will kill you, I'll kill you." Lewis testified that Officer Tucker had turned his gun towards defendant when defendant shot him.

Dr. Charles Garrett, the Carteret County medical examiner, testified that Officer Tucker was shot through the heart with a .45 caliber handgun from a distance of approximately three feet. Dr. Garrett opined that Officer Tucker was beneath the shooter when the gun was fired since the bullet entered his body seventeen inches from the top of his head and came to rest in a position some twenty-seven inches from the top of his head.

On his own behalf, defendant testified that Balch and Officer Tucker were trying to solicit his emotionally disturbed fifteen-year-old son to use and sell drugs. Defendant contends he confronted Balch on numerous occasions telling him to "stay the hell away from my son." Defendant first met with Balch at George's Party Pak "[t]o lay [a] cowboy whipping on his a—" for attempting to get his son in trouble. Even though he was armed with his .45 caliber handgun, he decided not to fight Balch when he saw that "Sand Man" was with him. Defendant then went along with the alleged drug sale in hopes of getting Balch alone at a future meeting. Defendant testified he asked Lewis to accompany him to the meeting on the day of the shooting solely to keep "Sand Man" from interfering while he fought with Balch.

Defendant further testified that while the four men examined the marijuana, he took two puffs of a joint and then tried unsuccessfully to hit Balch. Balch ran away and defendant could not follow him because of his bad back. When he turned back around, Officer Tucker was aiming a gun directly at Lewis and saying, "I am going to kill your d— a——." Defendant removed his gun from his waistband and responded, "I got a gun, too. Don't you shoot him. Please put that gun down. Put the gun down. For God's sake, put that gun down." Officer Tucker responded, "I am going to blow your f——— head off first" and aimed the gun at defendant. At this point, defendant testified he had time to cock his gun; say, "Oh, Lord heaven, help me. . . . Oh, God, help me"; and shoot Officer Tucker without Officer Tucker squeezing off a single round.

When defendant arrived home, he asked his wife to call the rescue squad and the police. He cleaned up, changed clothes, took a Valium, and drove back to the shore, apparently to commit suicide. While in the attic of an old scallop house, defendant changed his mind and threw the pistol away among the debris in the old building. Defendant then returned to the scene of the shooting where he learned from Balch that the man he had shot was a police officer. Defendant turned himself in and was arrested.

David testified that Balch approached him on numerous occasions about selling marijuana and cocaine for him. He claims he refused on each occasion and after a while, even refused to accept his telephone calls. On the occasion that Balch went to the Bell residence looking for David, defendant confronted Balch on David's behalf. Martha Lewis Bell ("Martha"), defendant's wife, testified that Balch called her home looking for David approximately three dozen times during September of 1991. She recalled that her husband became quite upset upon learning that Balch was soliciting David to deal drugs and decided to punish him himself. Defendant went to the meeting on 14 November 1991 intending to "break him from sucking eggs." When he returned from the meeting, defendant told her he had shot a man and asked her to call the authorities. He added, "I have got to go back, Martha, I have shot a man. I have got to go back and face what I have done." About forty-five minutes later, her brother, Lewis, called and said, "Guy shot that man . . . . If Guy hadn't shot him, I would be dead."

Additional facts, when necessary, will be set forth with respect to the various issues.

[1] In his first assignment of error, defendant contends the trial court erred in failing to exclude *ex mero motu* certain remarks by the prosecutor concerning the victim's family during *voir dire* and closing arguments. We have carefully reviewed the text of the challenged remarks and find no abuse of the trial court's discretion in failing to intervene absent any objection.

*Voir Dire.* During selection of the jury, the prosecutor asked the victim's father, brother, stepmother, and grandmother to stand up and then asked the prospective jurors if any of them had "ever seen these folks before today." Later, upon calling another prospective juror, the prosecutor requested only the victim's father to stand and merely pointed out the rest of the victim's family. On one other occasion, the prosecutor asked a prospective juror if she recognized any of Officer

STATE v. BELL

[338 N.C. 363 (1994)]

Tucker's family sitting in the courtroom. Defendant did not object to any of these questions. We have held that "[t]he mere identification of family members present in the courtroom at the opening of the proceedings [does] not constitute the use of highly prejudicial and irrelevant evidence as prohibited by *Booth*."[1] *State v. Laws*, 325 N.C. 81, 103, 381 S.E.2d 609, 622 (1989), *death sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, —— U.S. ——, 116 L. Ed. 2d 174, *reh'g denied*, —— U.S. ——, 116 L. Ed. 2d 648 (1991). In the present case the identification of the family to determine whether prospective jurors knew them did not require *ex mero motu* intervention by the trial court.

[2] Defendant also contends the prosecutor asked one prospective juror if he could give defendant, the victim's family, and the State a fair trial. Our review of the transcript reveals that the question was posed on at least three occasions. On two of these, no objection was raised. On the third occasion, defendant did object to the question and was overruled. We find no impropriety in asking the jury to judge the facts in a manner fair to all parties. *See State v. Artis*, 325 N.C. 278, 330, 384 S.E.2d 470, 499-500 (1989) ("[I]t is not improper to remind the jury, as the prosecutor did here, that its voice is the conscience of the community."), *death sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). The trial court properly overruled defendant's sole objection to this question and declined to intervene *ex mero motu* on the other two occasions.

*Closing Argument*. Defendant also contends the remarks of the prosecutor during his closing argument were irrelevant and designed solely to inflame the passions of the jury. The district attorney argued:

MR. MCFADYEN: . . . Every time you celebrate Christmas you think about a family out there that is going to sit back—

MR. NOBLES: Objection.

MR. MCFADYEN: —sit by a Christmas tree—

THE COURT: Sustained.

MR. MCFADYEN: And they are going to think about that man right there.

---

1. *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440 (1987), holding victim impact evidence inadmissible, was overruled by *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720 (1991), which held that a State may choose to permit admission of victim impact evidence without violating the Eighth Amendment *per se. Id.* at 827, 115 L. Ed. 2d at 736.

THE COURT: Sustained.

MR. McFADYEN: Sir, I would—

THE COURT: I would not—well—

MR. McFADYEN: I would like certainly to be heard, Judge.

THE COURT: Well, I think your forecast is—come up.

MR. McFADYEN: I would like to be heard at the bench.

[Discussion at bench with all counsel and the defendant present.]

MR. McFADYEN: Folks, my comments to you finally will be briefly, you know, I don't know why it is we are not supposed to think and talk about this man, because he is the victim. But I hope that you folks will think about this man (pointing to picture), Donald Ray Tucker, 22-year-old, and think about what effect the acts of the defendant had and what he did to this man and his family on the 14th day of November of last year.

THE COURT: Sustained as to the effect on the family, but you may speak with respect to the decedent.

The trial court sustained the objection or intervened *ex mero motu* each time the prosecutor mentioned any effect of the killing upon the victim's family. Defendant did not request special instructions following the court's rulings and has not shown any gross improprieties which the trial court failed to correct.

Defendant now argues, however, that the district attorney's conduct amounted to prejudicial error since the evidence of defendant's guilt was not overwhelming and since defendant interposed scattered objections to the challenged statements. While we do not condone the prosecutor's continued comments following the court's ruling on defendant's objection, we conclude that the record provides substantial evidence supporting defendant's conviction for first-degree murder. "In the absence of a showing of prejudice, prosecutorial misconduct in the form of improper jury argument does not require reversal." *State v. Boyd*, 311 N.C. 408, 418, 319 S.E.2d 189, 197 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985). This assignment of error is overruled.

[4] Defendant next assigns error to the trial court's failure to grant defendant's motion for change of venue. In support of his motion, defendant submitted several newspaper articles and a videotape of

the television coverage which allegedly contain hearsay and an allegation by the sheriff that the victim had been murdered. Defendant argues that this adverse publicity and the fact that the victim was a police officer produced a situation where it was impossible for him to receive a fair trial in Carteret County. In denying the motion, the trial court noted that the news items appeared to be "essentially recitals of alleged facts, some of which are in dispute, some of which are not in dispute."

In reviewing the trial court's decision, we look to several well-established principles.

The test for determining whether venue should be.changed is whether "it is reasonably likely that prospective jurors would base their decision in the case upon pre-trial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." [*State v. Jerrett*, 309 N.C. 239, 255, 307 S.E.2d 339, 347 (1983).] The burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried rests upon the defendant. *State v. Madric*, 328 N.C. 223, 226, 400 S.E.2d 31, 33 (1991). "In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial." *Jerrett*, 309 N.C. at 255, 307 S.E.2d at 348. The determination of whether a defendant has carried his burden of showing that pre-trial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. *Madric*, 328 N.C. at 226, 400 S.E.2d at 33. The trial court has discretion, however, only in exercising its sound judgment as to the weight and credibility of the information before it, including evidence of such publicity and jurors' averments that they were ignorant of it or could be objective in spite of it. When the trial court concludes, based upon its sound assessment of the information before it, that the defendant has made a sufficient showing of prejudice, it must grant defendant's motion as a matter of law. *See State v. Abbott*, 320 N.C. 475, 478, 358 S.E.2d 365, 368 (1987).

*State v. Yelverton*, 334 N.C. 532, 539-40, 434 S.E.2d 183, 187 (1993).

After reviewing the newspaper articles and the videotape submitted by the defendant, we are satisfied that defendant has failed to meet his burden of proving that the pretrial publicity tainted his chances of receiving a fair and impartial trial. The articles which appeared in local and state newspapers from 15 November 1991 through 20 November 1991, and the short news segments on the videotape are primarily factual accounts of the murder of Officer Tucker, the arrest of defendant, and the two-day search in the Croatan National Forest for Lewis. "This Court has consistently held that factual news accounts regarding the commission of a crime and the pretrial proceedings do not of themselves warrant a change of venue." *State v. Gardner*, 311 N.C. 489, 498, 319 S.E.2d 591, 598 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985).

We have repeatedly held that "[t]he best and most reliable evidence as to whether existing community prejudice will prevent a fair trial can be drawn from prospective jurors' responses to questions during the jury selection process." *State v. Madric*, 328 N.C. 223, 228, 400 S.E.2d 31, 34 (1991). While a number of the prospective jurors questioned in this case indicated they had read or heard of the crime, each juror who actually served on the jury stated unequivocally that he or she had formed no opinion about the case, could be fair and impartial, and would decide the issues based solely upon the evidence presented at trial. Therefore, we conclude that the trial court did not err in denying defendant's motion for a change of venue.

[5] Defendant further argues that the trial court erred by failing to allow defendant to individually question each prospective juror during *voir dire* with respect to pretrial publicity. Defendant contends the collective *voir dire* served only to educate any prospective juror who remained unaware of the adverse publicity surrounding defendant. However, defendant has made no such showing and this argument amounts to mere speculation. *See State v. Johnson*, 298 N.C. 355, 362, 259 S.E.2d 752, 757 (1979). Defendant's argument is without merit.

[6] In his next assignment of error, defendant contends the trial court erred in denying defense counsel's repeated requests to allow defendant to personally ask each juror, "would they listen to my case and be fair?" Defendant argues that there is no statutory prohibition against a criminal defendant's involvement in *voir dire* and that a juror's response to a specific question asked directly by the defendant could be beneficial in selecting an impartial jury.

STATE v. BELL

[338 N.C. 363 (1994)]

Defendant's argument directly contradicts previous holdings of this Court. Relying on *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562 (1975), this Court has determined "that a defendant in a criminal action has a right to represent himself at the trial and cannot be required to accept the services of court-appointed counsel." *State v. House*, 295 N.C. 189, 204, 244 S.E.2d 654, 662 (1978). "It is, however, equally well settled that '[a] party has the right to appear *in propria persona* or by counsel, but this right is alternative,' so that 'one has no right to appear both by himself and by counsel.' " *Id.* (quoting *State v. Phillip*, 261 N.C. 263, 268, 134 S.E.2d 386, 391, *cert. denied*, 377 U.S. 1003, 12 L. Ed. 2d 1052, *reh'g denied*, 379 U.S. 874, 13 L. Ed. 2d 83 (1964)).

In *House*, defendant requested that, in addition to questioning by his counsel, he personally be permitted to question prospective jurors on *voir dire* and witnesses at the trial. In upholding the trial court's decision denying the request, this Court noted that "while the defendant elected to retain the services of the court-appointed counsel, the court did not err in holding that the interrogation of prospective jurors and of witnesses must be done through his counsel." *House*, 295 N.C. at 204, 244 S.E.2d at 662. Similarly, defendant here was not entitled to ask questions of prospective jurors while represented by counsel. Defendant's assignment of error is without merit.

[7] In his next assignment of error, defendant contends the trial court erred in admitting into evidence, over objection by defendant, a photograph taken of the victim prior to his death. In the photograph, Officer Tucker is wearing his police uniform and standing in front of a patrol car. Defendant contends the photograph was introduced solely to inflame the passions of the jury and to support the State's argument that defendant killed a law enforcement officer in the performance of his duty. Defendant argues that the photograph may have been relevant had defendant known that the victim was actually a police officer. However, since defendant believed Officer Tucker to be a drug dealer at the time of the killing, the identity of Officer Tucker, his status as a police officer, and any other facts established by the photograph are irrelevant to the issues presented to the jury in this case. We disagree.

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury."

*State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). The single photograph of Officer Tucker is neither gory nor gruesome and it was not used excessively or repetitively during the trial. The introduction of the photograph was not aimed solely at arousing the passions of the jury, but was admitted to establish the victim's size.

During the direct examination of Detective Boyce Floyd, the following question was posed:

Q. Does that photograph fairly and accurately depict Donald Tucker as to his size and approximate weight at the time of his death?

A. Yes, sir.

Following this exchange, the State moved to introduce the photograph of Officer Tucker into evidence. In overruling the defendant's objection, the court informed the jury that State's Exhibit #5 was "admitted for illustrative purposes, members of the jury. You may consider it for that purpose and that purpose only."

Defendant's defense of self-defense necessitated the State's showing that a much larger man attacked Officer Tucker and knocked him to the ground, following which defendant shot and killed him. Detective Floyd had previously testified that Officer Tucker weighed 190-200 pounds and was approximately five feet ten or eleven inches tall. Under these circumstances, the photograph was properly admitted to illustrate that Officer Tucker actually appeared as described by Detective Floyd. This assignment of error is also without merit.

Defendant next assigns error to the trial court's refusal to allow questioning of Balch, the State's key witness, regarding his prior convictions and several prior acts of misconduct allegedly committed by him.

[8] A. Prior Convictions. Rule 609 of the North Carolina Rules of Evidence allows, for purposes of impeachment, the cross-examination of witnesses, including defendant, with respect to prior convictions. *State v. Finch*, 293 N.C. 132, 235 S.E.2d 819 (1977). "[W]here, for purposes of impeachment, the witness has admitted a prior conviction, the time and place of the conviction and the punishment imposed may be inquired into upon cross-examination." *Id.* at 141, 235 S.E.2d at 825. "[I]nquiry into prior convictions which exceeds the limitations established in *Finch* is reversible error." *State v. Rathbone*, 78 N.C. App. 58, 64, 336 S.E.2d 702, 705 (1985), *cert. denied*, 316 N.C. 200, 341

S.E.2d 582 (1986). Expressly overruling a line of cases apparently expanding this line of reasoning, the Court recently returned to the *Finch* rationale in holding:

> In the interest of clarity and certainty for the bench and bar, we conclude that we should overrule *Harrison* and *Gibson* and adhere to the rule established in *Garner, viz*, that the "*Finch . . .* limitations on inquiries concerning prior convictions are consistent with rule 609(a)."

*State v. Lynch*, 334 N.C. 402, 410, 432 S.E.2d 349, 353 (1993) (quoting *State v. Garner*, 330 N.C. 273, 288-89, 410 S.E.2d 861, 870 (1991)). In light of *Lynch*, we find that the trial court properly restricted defendant's questioning of Balch on his prior convictions for breaking and entering and larceny to the time and place of the convictions and the penalties imposed thereon.

B. <u>Prior Acts of Misconduct</u>. Rule 608(b) of the North Carolina Rules of Evidence governs the admissibility of specific acts of misconduct where (i) the purpose of the inquiry is to show conduct indicative of the actor's character for truthfulness or untruthfulness; (ii) the conduct in question is in fact probative of truthfulness or untruthfulness; (iii) the conduct in question is not too remote in time; (iv) the conduct did not result in a conviction; and (v) the inquiry takes place during cross-examination. *See State v. Morgan*, 315 N.C. 626, 634, 340 S.E.2d 84, 89-90 (1986). "Among the types of conduct most widely accepted as falling into this category are 'use of false identity, making false statements on affidavits, applications or government forms (including tax returns), giving false testimony, attempting to corrupt or cheat others, and attempting to deceive or defraud others.' " *Id.* at 635, 340 S.E.2d at 90 (quoting 3 D. Louisell & C. Mueller, *Federal Evidence* § 305 (1979)).

[9] Defendant, on cross-examination, proposed to question Balch concerning his involvement in several alleged specific instances of misconduct, *i.e.*, possession with intent to sell marijuana, conspiracy to commit larceny and larceny of a wave runner, conspiracy to commit larceny and larceny of a 1986 Sea Ox boat and trailer, conspiracy to commit larceny and larceny of a 1989 Bayliner boat and trailer, and various conversations with Billy Simmons concerning stealing other property. Defendant has failed to show how these incidents are relevant to the witness' general veracity. These instances of alleged prior and unrelated acts of larceny and possession of marijuana, without more, are not necessarily probative of Balch's propensity for truth-

fulness or untruthfulness under the standard imposed by Rule 608(b). The trial court properly restricted defendant's questioning of Balch's alleged prior acts of misconduct.

**[10]** Defendant further intended to question Balch concerning an attempt by Balch to lure an acquaintance away from his home so his accomplices could break into the residence and steal the property inside. This line of questioning should have been allowed as bearing on the witness' propensity to deceive and defraud others. *See State v. Clark*, 319 N.C. 215, 353 S.E.2d 205 (1987). In *Clark*, defendant propounded questions to the witness which, had he been allowed to answer, would have indicated that:

> after Mr. Givens [witness] had left his employment with a fire extinguisher company he went to customers of the company and represented to them that he was there to inspect the fire extinguishers. When left alone he would steal money if any was in the room.

*Id.* at 218, 353 S.E.2d at 206. The witness deliberately misrepresented himself to his former employer's customers in an effort to defraud them. Similarly, Balch misrepresented himself to his friend while his accomplices stole or attempted to steal his friend's belongings. In each case, these misrepresentations speak to the veracity of the witness. As in *Clark*, the trial court erred in failing to allow defendant to question the witness on this particular alleged specific act of misconduct.

However, the exclusion of this testimony does not constitute prejudicial error. The statutory test for errors not relating to a right under the Constitution of the United States is that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (1988). The record establishes that Balch admitted to the jury during either direct or cross-examination that (i) he had previously used and sold marijuana; (ii) he pled guilty to charges of breaking and entering and larceny; (iii) he served time in prison for his convictions; and (iv) he became an informant partially to improve his efforts at plea bargaining. The jury had before it sufficient evidence to evaluate Balch's credibility, including proof of bias. No reasonable possibility exists that a different result would have been reached had the testimony in question been allowed. Hence, the error is harmless.

**[11]**  In his next assignment of error, defendant contends the trial court erred in sustaining the State's objection to relevant testimony offered by defendant. During direct examination of defendant, defense counsel attempted to establish defendant's motive in going to the scene of the fatal shooting by having defendant testify concerning statements made to him by his fifteen-year-old son, David, regarding solicitations by Balch. The State entered a hearsay objection. Defendant argued that the testimony was offered only to show his motivation, not to prove the truth of the matter asserted. The trial court sustained the State's objection and disallowed the testimony.

Later, upon reconsideration, the court reversed its ruling and allowed defense counsel, during redirect, to question defendant extensively concerning conversations between his son and Balch. Defendant related to the jury details of encounters and conversations David had with Balch during which Balch attempted to buy, sell, or trade cocaine and hashish with him. Although the testimony was ultimately allowed, defendant contends the original erroneous ruling caused him undue prejudice because he lost "the inherent advantage produced when a witness first speaks to the jury through direct examination by his own counsel." We disagree.

Exceptions to the exclusion of competent testimony become immaterial when it appears that the trial judge subsequently revised his rulings and admitted the testimony. See *Poole v. Gentry*, 229 N.C. 266, 49 S.E.2d 464 (1948). This assignment of error is without merit.

**[12]**  Defendant next contends the trial court erroneously failed to exclude *ex mero motu* certain testimony elicited during cross-examination of defendant's son, David, and defendant's wife, Martha. Defendant contended throughout the trial that he went to Bluewater Banks not to buy or steal marijuana from Balch and Officer Tucker but merely to confront Balch concerning Balch's repeated attempts to lure his son, David, into using drugs. To contradict this assertion, the State needed to show that David was already involved in the drug culture of Carteret County and that defendant was aware of his son's involvement. The trial court allowed the prosecutor to question David concerning his use of marijuana and Martha concerning her knowledge of her son's involvement with illegal drugs. Defendant raised no objection during cross-examination of either witness.

Now, on appeal, defendant, relying on *State v. Morgan*, 315 N.C. 626, 340 S.E.2d 84 (1986), argues it is well settled in North Carolina that questions regarding a witness' prior involvement with or use of

illegal drugs are not proper grounds for impeachment. In *Morgan* this Court in discussing N.C.G.S. § 8C-1, Rule 608(b) stated:

> [E]vidence routinely disapproved as irrelevant to the question of a witness' general veracity (credibility) includes specific instances of conduct relating to "sexual relationships or proclivities, the bearing of illigitimate [sic] children, the use of drugs or alcohol, . . . *or violence against other persons.*"

*Morgan*, 315 N.C. at 635, 340 S.E.2d at 90 (quoting 3 D. Louisell & C. Mueller, *Federal Evidence* § 305 (1979)). Rule 608(b) generally bars evidence of specific instances of conduct of a witness for the purpose of attacking his credibility. In the case *sub judice*, the State was not attempting to impeach either David or Martha Bell's general reputation for veracity. Rather, the State was trying to rebut their testimony on direct examination. Each witness, during direct examination by defense counsel, testified that David was being lured into the drug culture by Balch. On cross-examination, the State was attempting to show that David was already deeply involved in the drug scene and that defendant was aware of this involvement.

The import of the two lines of questioning was not to demonstrate the witnesses' character for truthfulness or untruthfulness but to shed light on defendant's true intent in meeting Balch and Officer Tucker at Bluewater Banks. The fact that David, with his parents' knowledge, had been using and selling illegal drugs for years casts doubt on defendant's contention that his purpose in going to Bluewater Banks was merely to confront Balch for attempting to lure David into drugs. As such, the testimony was relevant and the cross-examination permissible under N.C.G.S. § 8C-1, Rule 611(b). The trial court did not err in not intervening *ex mero motu* in the cross-examination. This assignment of error is overruled.

[13] Next, defendant contends the trial court erred in instructing the jury that if it concluded defendant had killed Officer Tucker in the perpetration of a felony, defendant could not avail himself of the defense of self-defense. Defendant argues that the effect of this instruction was devastating since he relied solely on a theory of self-defense. The challenged instruction provided:

> THE COURT: I charge you further that the defendant has been accused of first-degree murder in the perpetration of a felony, which is the killing of a human being by a person attempting to commit robbery with a firearm.

I instruct you that neither the issue of self-defense or death by accident is available to the defendant, and neither are to be considered by you in connection with the accusation of first-degree murder in perpetration of a felony.

Our legislature has defined capital felony murder as:

A murder which shall be . . . committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree, and any person who commits such murder shall be punished with death or imprisonment in the State's prison for life as the court shall determine pursuant to G.S. 15A-2000 . . . .

N.C.G.S. § 14-17 (1993). Premeditation and deliberation are not elements of the crime of felony murder. *State v. Wall*, 304 N.C. 609, 286 S.E.2d 68 (1982). The prosecution need only prove that the killing took place while the accused was perpetrating or attempting to perpetrate one of the enumerated felonies. By not requiring the State to prove the elements of murder, the legislature has, in essence, established a *per se* rule of accountability for deaths occurring during the commission of felonies.

Based on this premise, other jurisdictions have held that an aggressor in a violent confrontation forfeits his right to self-defense.

When a defendant is charged under this [felony-murder] statute, the defense of self-defense is unavailable to him as a matter of law because he is an aggressor engaged in the perpetration of a felony. *Street v. State*, 26 Md. App. 336, 340, 338 A.2d 72 (1975). This Maryland construction of the felony-murder statute comports with the general rule on the subject of the non-availability of self-defense as a defense to felony-murder.

*Street v. Warden*, 423 F. Supp. 611, 613-14 (Md.), *aff'd*, 549 F.2d 799 (4th Cir. 1976), *cert. denied*, 431 U.S. 906, 52 L. Ed. 2d 390 (1977). In *Gray v. State*, 463 P.2d 897, 909 (Alaska 1970), the court stated:

[A] person who commits an armed robbery forfeits his right to claim as a defense the necessity to protect himself against the use of excessive force by either the intended victim of the robbery or by any person intervening to prevent the crime or to apprehend the criminal, absent a factual showing that at the time the vio-

lence occurred, the dangerous situation created by the armed robbery no longer existed.

*See also Rainer v. State*, 342 So. 2d 1348 (Ala. Crim. App. 1977); *State v. Celaya*, 135 Ariz. 248, 660 P.2d 849 (1983); *People v. Loustaunau*, 181 Cal. App. 3d 163, 226 Cal. Rptr. 216 (1986); *Williams v. State*, 256 Ga. 655, 352 S.E.2d 756 (1987); *People v. Abrams*, 109 Ill. App. 3d 901, 441 N.E.2d 352 (1982); *State v. Marks*, 226 Kan. 704, 602 P.2d 1344 (1979); *Street v. State*, 26 Md. App. 336, 338 A.2d 72 (1975); *State v. Gray*, 456 N.W.2d 251 (Minn. 1990), *cert. denied*, 498 U.S. 1030, 112 L. Ed. 2d 678 (1991); *Layne v. State*, 542 So. 2d 237 (Miss. 1989); *People v. Guraj*, 105 Misc. 2d 176, 431 N.Y.S.2d 925 (1980); *Smith v. State*, 209 Tenn. 499, 354 S.W.2d 450 (1961); *Davis v. State*, 597 S.W.2d 358 (Tex. Crim. App.), *cert. denied*, 449 U.S. 976, 66 L. Ed. 2d 238 (1980); *State v. Dennison*, 115 Wash. 2d 609, 801 P.2d 193 (1990).

We previously reviewed this issue in *State v. Maynor*, 331 N.C. 695, 417 S.E.2d 453 (1992). There, "we assume[d] *arguendo* but [did] not decide that in certain circumstances, some instruction on the doctrine of self-defense as a defense to first-degree murder under the felony murder theory may be proper." *Id.* at 699, 417 S.E.2d at 455. In a felony-murder prosecution, a person who is found by the jury to be engaged in an attempted robbery must be considered the initial aggressor; it is immaterial whether the victim of the robbery or the defendant fired first. *Guraj*, 105 Misc. 2d at 178, 431 N.Y.S.2d at 927. " '[T]he accused cannot set up in his own defense a necessity which he brought upon himself.' " *Celaya*, 135 Ariz. at 254, 660 P.2d at 855 (quoting *State v. Jones*, 95 Ariz. 4, 8, 385 P.2d 1019, 1021 (1963)).

**[14]** We now hold that, absent (i) a reasonable basis upon which the jury may have disbelieved the prosecution's evidence of the underlying felony, *Layne*, 542 So. 2d at 244; (ii) a factual showing that defendant clearly articulated his intent to withdraw from the situation; or (iii) a factual showing that at the time of the violence the dangerous situation no longer existed, *Gray*, 463 P.2d at 909, defendant has forfeited his right to claim self-defense as a defense to felony murder. Here, the evidence tends to show and the jury found that defendant and Lewis went to Bluewater Banks for the purpose of robbing the victim and Balch of marijuana. No evidence was presented to suggest that the dangerous situation had dissipated at the time of the shooting or that defendant made any effort to declare his intent to withdraw. This assignment of error is overruled.

[15] Defendant next contends the trial court erred in instructing the jury on premeditation and deliberation because the evidence adduced at trial failed to support such a finding. We disagree.

When measuring the sufficiency of the evidence, direct or circumstantial, competent or incompetent, the evidence must be considered in the light most favorable to the State. The State must be given the benefit of every reasonable inference to be drawn from the evidence and any contradictions in the evidence are to be resolved in favor of the State. *State v. Sumpter*, 318 N.C. 102, 107-08, 347 S.E.2d 396, 399 (1986).

"Premeditation is defined as thought beforehand for some length of time; deliberation means an intention to kill, executed by defendant in a 'cool state of blood' in furtherance of a fixed design or to accomplish some unlawful purpose." *State v. Jones*, 303 N.C. 500, 505, 279 S.E.2d 835, 838 (1981). "Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence." *State v. Brown*, 315 N.C. 40, 59, 337 S.E.2d 808, 823 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *rev'd on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

> Among the circumstances which may be considered as tending to show premeditation and deliberation are: (1) the want of provocation on the part of the victim, (2) the defendant's conduct and statements before and after the killing, (3) threats made against the victim by the defendant, (4) ill will or previous difficulty between the parties, (5) evidence that the killing was done in a brutal manner. *See State v. Calloway*, [305 N.C. 747, 291 S.E.2d 622 (1982)]; *State v. Potter*, 295 N.C. 126, 244 S.E.2d 397 (1978); *State v. Thomas*, 294 N.C. 105, 240 S.E.2d 426 (1978). The nature and number of the victim's wounds is also a circumstance from which an inference of premeditation and deliberation may be drawn, *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, *cert. denied*, 459 U.S. 1080, 103 S.Ct. 503, 74 L.Ed.2d 642 (1982), as is the number of blows inflicted upon the victim. *State v. Love*, 296 N.C. 194, 250 S.E.2d 220 (1978); *State v. Thomas, supra*.

*State v. Myers*, 309 N.C. 78, 84, 305 S.E.2d 506, 510 (1983).

Viewed in the light most favorable to the State, the evidence was sufficient to support a conclusion that the murder was premeditated

and deliberate. Defendant carried a gun with him during the attempted robbery, indicating he anticipated a violent confrontation and the potential need for deadly force. On the way to the meeting, defendant removed the clip from his semiautomatic pistol, ejected the round from the chamber, replaced the round in the clip, reinserted the clip, and chambered a live round of ammunition, thus readying the weapon for firing. Defendant's own testimony suggests he harbored ill will towards Balch and "Sand Man" (Officer Tucker). Defendant testified he set up the meeting "[t]o lay [a] cowboy whipping on his a—." Finally, at the scene of the confrontation, Balch testified that after Lewis backhanded Officer Tucker, knocking him to the ground, defendant stood over him silhouetted against the white Mustang. The fully extended hammer on the weapon was readily apparent. Officer Tucker, attempting to rise from the ground, reached for his weapon and stated, "Stop or I'll shoot." Defendant replied, "You won't shoot anybody" and shot Officer Tucker through the heart. These facts, among others, support a reasonable inference that there was a lack of provocation on the part of Officer Tucker, that defendant was prepared for an armed confrontation, and that the fatal shooting of Officer Tucker was premeditated and deliberate. We conclude that the trial court did not err in instructing the jury on premeditation and deliberation.

[16] Defendant also complains that the instruction, as given, constituted prejudicial error because the trial court instructed on several circumstances from which premeditation and deliberation may be inferred which were not supported by the evidence. The trial court instructed the jury as follows:

Neither premeditation or deliberation are usually susceptible of direct proof. They may be proved by circumstances from which they may be inferred, such as the lack of provocation by the victim; the conduct of the defendant before, during and after the killing; threats and declarations of the defendant, or of the decedent; use of grossly excessive force; and whether or not the defendant inflicted a lethal wound upon the victim when the victim was fell [sic]; and brutal or vicious circumstances of the killing; the manner in which or the means by which the killing was done.

While arguing that none of the enumerated circumstances are present in his case, defendant contends that the evidence specifically does not reveal (i) lack of provocation by the victim; (ii) premeditation and

deliberation on the part of defendant based upon his conduct before, during, and after the shooting; (iii) any threats made against the victim by defendant; (iv) the use of grossly excessive force by defendant; (v) a killing done in a brutal or vicious manner; or (vi) infliction of lethal wounds upon the victim after he was felled.

Although defendant objected to the trial judge's charging the jury on premeditation and deliberation in general, he raised no objection to the instruction as actually given. Therefore, the challenged instruction is reviewable only under plain error analysis. Under this standard of review, defendant must demonstrate that, "absent the alleged error, [the] jury probably would have reached a different verdict." *State v. Robinson*, 330 N.C. 1, 22, 409 S.E.2d 288, 300 (1991). The appellate court must be convinced that the instruction actually "tilted the scales" in favor of conviction. *Id.* Even assuming, *arguendo*, that there was error in the instruction given, defendant has failed to demonstrate that, absent the challenged portions of the instruction, the jury would probably have reached a different verdict.

This case comes down to whether the jury believed defendant's version of the events occurring on 14 November 1991 or the State's version of the events. As we have previously noted, based on the State's evidence, the jury reasonably concluded that defendant killed Officer Tucker with premeditation and deliberation during the commission of an armed robbery. The jury specifically rejected verdicts of second-degree murder and voluntary and involuntary manslaughter. *See State v. Faison*, 330 N.C. 347, 362-63, 411 S.E.2d 143, 152 (1991). We do not believe the instruction as given "tilted the scales" in favor of conviction. Defendant has not met his burden under the plain error rule. This assignment of error is overruled.

[17] In his next assignment of error, defendant contends the trial court erred in failing to give his requested instruction to the jury on self-defense. The proposed instruction provided that "[a]s long as a person keeps his gun in his hand prepared to shoot, the person opposing him is not expected or required to accept any statement indicative of an intent to discontinue the assault." Defendant argues that the requested instruction would have clearly explained the insignificance, from a legal standpoint, of the fact that Officer Tucker, when he had the opportunity to fire his weapon, did not do so. However, defendant has cited this passage out of context and, as a result, his argument misconstrues the law on self-defense.

Defendant's reliance on *State v. Winford*, 279 N.C. 58, 181 S.E.2d 423 (1971), is misplaced. The paragraph containing defendant's requested instruction reads as follows:

". . . In order that the right of self-defense may be restored to a person who has provoked or commenced a combat, he must attempt in good faith to withdraw from the combat. He must also in some manner make known his intention to his adversary; and if the circumstances are such that he cannot notify his adversary, as where the injuries inflicted by him are such as to deprive his adversary of his capacity to receive impressions concerning his assailant's design and endeavor to cease further combat, it is the assailant's fault and he must bear the consequences. As long as a person keeps his gun in his hand prepared to shoot, the person opposing him is not expected or required to accept any act or statement as indicative of an intent to discontinue the assault."

*Id.* at 68-69, 181 S.E.2d at 430 (quoting 40 C.J.S. *Homicide* § 121, at 995 (1991)). When read in context, the passage clearly shows that in order for the aggressor to regain his right of self-defense, he must actively alert his victim to the fact that he intends to cease further aggression. As long as the aggressor keeps his weapon at the ready, the victim is not expected to accept any act or statement as an intent to cease the assault.

As in *Winford*, the evidence in the record does not support a finding that defendant attempted, at any point, to withdraw from the combat or that he ever indicated to Officer Tucker that he intended to withdraw from the combat. The trial court is required to give the substance of a requested charge only if the proposed charge is a correct statement of the law and is supported by the evidence. *State v. Corn*, 307 N.C. 79, 296 S.E.2d 261 (1982). The trial court properly declined to give the requested instruction.

Defendant next contends the trial court erred in the charge on first-degree murder by instructing the jury that (i) defendant's actions would not be justified as self-defense were the jury to find him to be the aggressor; (ii) if the victim were the aggressor, and defendant responded with excessive force, defendant would at most be justified under the doctrine of imperfect self-defense; (iii) the jury could infer the killing was unlawful and committed with malice; and (iv) the jury must find that defendant formed the intent to kill the victim over some period of time, however short, in order to find the defendant guilty of first-degree murder based upon premeditation and delibera-

tion. Defendant's proposed instruction omitted each of these references because defendant contended no evidence was presented to support an inference that defendant was the aggressor, used excessive force to protect himself, or formed an intent to kill Officer Tucker.

**[18]** Defendant's argument ignores Balch's testimony that defendant pulled his weapon on Officer Tucker after Lewis had knocked the officer to the ground and that Officer Tucker never actually drew his gun. Viewed in the light most favorable to the State, this evidence supports instructing the jury that defendant may not claim self-defense if the jury finds defendant was the aggressor in the encounter leading to the fatal shooting. *See State v. Johnson*, 278 N.C. 252, 258, 179 S.E.2d 429, 432-33 (1971).

**[19]** We also conclude that the instruction, as given, correctly states the law on the use of excessive force in self-defense. Whether defendant in fact used excessive force is a question for the jury to determine based on the evidence. *See State v. Benge*, 272 N.C. 261, 264, 158 S.E.2d 70, 72 (1967). Here, the testimony of various witnesses differed as to when Officer Tucker and defendant drew their weapons and as to the circumstances leading to the fatal shot. The trial court properly instructed the jury that if it found defendant to have used excessive force in defending himself, he is entitled, at most, to the defense of imperfect self-defense. *State v. McAvoy*, 331 N.C. 583, 595-96, 417 S.E.2d 489, 497 (1992).

**[20]** The instruction, furthermore, correctly charged the jury that it could infer the killing was committed with malice. *State v. Maynard*, 311 N.C. 1, 33, 316 S.E.2d 197, 214-15 ("[T]he law implies that a killing was done with malice and unlawfully when the defendant intentionally inflicts a wound upon a victim with a deadly weapon resulting in death."), *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). Relying on the pattern jury instruction, the trial court instructed the jury:

If the State proves beyond a reasonable doubt that the defendant intentionally killed the victim with a deadly weapon or intentionally inflicted a wound upon the deceased with a deadly weapon that proximately caused the victim's death, you may first infer that the killing was unlawful; and second, that it was done with malice. But you are not compelled to do so. You may consider this along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done

with malice. And in this regard I instruct you that a firearm, a .45 caliber pistol, is a deadly weapon, as a matter of law.

[21] Finally, the instruction properly charged the jury that, to convict defendant of first-degree murder based on premeditation and deliberation, it would have to find that defendant formed the intent to kill the victim over some period of time, however short. We have repeatedly held that premeditation means that the act was thought out beforehand for some length of time. No particular amount of time is necessary for the mental process of premeditation. *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980). This assignment of error is without merit.

[22] In his next assignment of error, defendant contends the trial court erred in failing to give his requested instruction that the conspiracy charge could not be used as the underlying felony for a conviction of first-degree murder based upon felony murder. Our review of the instruction reveals that the trial court properly instructed the jury it could consider only the attempted armed-robbery charge as the underlying felony. This assignment of error is overruled.

[23] Defendant next contends the trial court erred in failing to set aside for lack of evidence the verdicts of guilty of attempted armed robbery, conspiracy to commit armed robbery, and first-degree murder. Defendant grounds his argument on the lack of any evidence tending to show that defendant and Lewis planned to use the gun, that the gun was used to threaten Officer Tucker, or that the gun was used during an attempted robbery. However, this argument ignores other relevant testimony presented at trial.

Lewis testified that defendant told Lewis of defendant's plan to rob Officer Tucker and Balch of the marijuana. In preparation, defendant armed himself with his pistol and chambered the weapon as the two men drove to Bluewater Banks for the confrontation. Any contradictions or discrepancies in the evidence are for the jury to resolve. *State v. Smith*, 291 N.C. 505, 513, 231 S.E.2d 663, 669 (1977). While there is no evidence of an express agreement to use the weapon, the conduct of the two men supports an implied understanding between them to use a gun in the commission of the crime. Furthermore, at the scene, Lewis did as he had been instructed when he knocked Officer Tucker down. Hence, the first step in the attempted armed-robbery plan occurred. That things did not go exactly as planned such that the conspirators did not actually take the drugs does not negate the attempted armed robbery. On the record before

us, the evidence is sufficient to support a finding by the jury that defendant was guilty of conspiracy to commit armed robbery and attempted armed robbery. The trial court did not abuse its discretion and properly denied defendant's motion to set aside these verdicts. Furthermore, as discussed more fully earlier in this opinion, the evidence amply supports the submission of first-degree murder based both on premeditation and deliberation and felony murder. The trial court properly denied defendant's motion to set aside the verdicts.

[24] Finally, defendant contends the trial court erred by imposing a separate sentence on the attempted armed-robbery charge in addition to the sentence for first-degree murder on the basis that the attempted armed robbery merged into the felony-murder conviction. As we have previously held, where defendant is convicted of first-degree murder based upon both premeditation and deliberation and felony murder, the underlying felony does not merge with the murder conviction and the trial court is free to impose a sentence thereon. *State v. Goodman*, 298 N.C. 1, 15, 257 S.E.2d 569, 579 (1979). This assignment of error is, thus, overruled.

We have carefully considered the entire record and find that defendant received a fair trial free from prejudicial error.

NO ERROR.